Filed 9/30/21

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| TINA TURRIETA, | B304701 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BC714153) |
| v. | |
| LYFT, INC., | |
| Defendant and Respondent; | |
| MILLION SEIFU et al., | |
| Movants and Appellants. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Dennis J. Landin, Judge. Affirmed.

Lichten & Liss-Riordan, Shannon E. Liss-Riordan, Anne Kramer for Appellant Million Seifu.

Outten & Golden, Jahan C. Sagafi, Laura Iris Mattes and Adam Koshkin; Olivier Schreiber & Chao, Monique Olivier, Christian Schreiber and Rachel Bien for Appellant Brandon

Olson.

Michael L. Smith as Amicus Curiae on behalf of Appellants.

The Graves Firm, Allen Graves and Jacqueline Treu for Plaintiff and Respondent.

Horvitz & Levy, Christopher D. Hu, Peder K. Batalden, and Felix Shafir; Keker, Van Nest & Peters, R. James Slaughter, Erin E. Meyer, Ian Kanig and Morgan E. Sharma for Defendant and Respondent.

---

Appellants Brandon Olson and Million Seifu and respondent Tina Turrieta worked as drivers for a rideshare company, respondent Lyft, Inc.  In 2018, Olson, Seifu, and Turrieta each filed separate representative actions against Lyft under the Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.),[1] alleging that Lyft misclassified its California drivers as independent contractors rather than employees, thereby violating multiple provisions of the Labor Code.  Following a mediation in 2019, Turrieta and Lyft reached a settlement.

After Turrieta moved for court approval of the settlement, appellants sought to intervene in the matter and object to the settlement.  Appellants argued that Lyft had engaged in a "reverse auction" by settling with Turrieta for an unreasonably low amount, and that the settlement contained other provisions that were unlawful and inconsistent with PAGA's purpose.  The trial court rejected appellants' requests to intervene, finding that appellants lacked standing.  The court found the settlement to be fair and adequate, and approved it.  The court also denied the

---

[1] All further statutory references are to the Labor Code unless otherwise indicated.

2

subsequent motions by appellants to vacate the judgment under Code of Civil Procedure section 663.

On appeal, appellants contend the trial court erred in approving the settlement, and in denying their motions to intervene and to vacate the judgment. Respondents argue that, as nonparties, appellants lack standing to seek any relief in this case, and further, that the settlement was proper. We agree with respondents and the trial court that appellants' status as PAGA plaintiffs in separate actions does not confer standing to move to vacate the judgment or challenge the judgment on appeal. Moreover, while appellants may appeal from the court's implicit order denying them intervention, we find no error in that denial. We therefore affirm.

**FACTUAL AND PROCEDURAL HISTORY**

I. *Initiation of PAGA Lawsuits by Drivers*

Olson, Seifu, and Turrieta each worked as drivers for Lyft. As alleged by Turrieta, Lyft is a transportation company that employs drivers to transport customers by automobile. Lyft uses a cell phone application to connect its drivers with riders seeking transportation. During the relevant period, Lyft "maintained a uniform policy of classifying all Drivers as independent contractors rather than employees."

On May 24, 2018, Olson filed his lawsuit, *Olson v. Lyft, Inc.* (Super. Ct. San Francisco County, No. CGC-18-566788) (*Olson*), alleging PAGA claims on behalf of the State of California and other similarly situated individuals who worked as drivers for Lyft in California. He alleged that Lyft willfully misclassified its drivers as independent contractors resulting in numerous Labor Code violations, and sought recovery of civil penalties under PAGA. Seifu filed his lawsuit on July 5, 2018, captioned *Seifu v.*

3

*Lyft, Inc.* (Super. Ct. Los Angeles County, No. BC712959) *(Seifu),* also alleging PAGA claims based on driver misclassification.[2] Turrieta filed the instant case on July 13, 2018 *(Turrieta).* Turrieta's complaint alleged six claims under PAGA for willful misclassification, failure to pay overtime wages, failure to timely pay wages, failure to pay wages upon termination, failure to provide accurate itemized paystubs, and failure to reimburse business expenses.

In April 2019, Olson filed a petition to coordinate five actions against Lyft pending in San Francisco and Los Angeles Superior Courts, including *Olson*, *Seifu*, and *Turrieta.* Lyft opposed the petition, as did Seifu and several other plaintiffs. The *Olson* court denied the petition without prejudice, noting that four of the five cases were currently stayed—*Seifu* and *Olson* pending resolution of appeals and *Turrieta* pending resolution of *Seifu*.[3]

## II.    *Settlement in* Turrieta

In September 2019, Turrieta and Lyft reached a settlement of her case following a mediation. Turrieta and Lyft signed the settlement agreement on December 4, 2019. The proposed settlement covered all individuals who provided at least one ride as a driver on Lyft's platform from April 30, 2017 to December 31, 2019. Lyft estimated the group to include a maximum of 565,000 individuals. The settlement required Lyft to pay $15

---

[2] During oral argument, counsel for Seifu and Olson clarified that Olson added his PAGA claims to his existing complaint in July 2018, after Seifu had filed his PAGA complaint. Thus, Seifu was the first of these three plaintiffs to file the PAGA claims at issue here.

[3] We granted Olson's request for judicial notice of the petition and court's order regarding coordination in *Olson*.

4

million in total, including a $14,000 enhancement payment to Turrieta, $5,048,087.34 in attorney fees and costs to Turrieta's counsel, $6,071,978.17 to be paid to PAGA group members,[4] and $3,215,934.50 in penalties paid to the state. Turrieta estimated that group members would receive an average payment of $12.

Under the settlement, the parties agreed to file a first amended complaint in *Turrieta* that "covers all PAGA claims that could have been brought against Lyft" for the relevant time period, so that those claims would be released by the settlement. In the proposed first amended complaint, Turrieta alleged four additional claims for failure to provide breaks, failure to store records, failure to pay minimum wage, and failure to provide hiring notice. The settlement expressly exempted from release any claims for damages (as opposed to penalties) and direct claims by group members other than Turrieta. On December 9, 2019, Turrieta gave notice of the settlement to the state through the California Labor and Workforce Development Agency (LWDA), including a copy of the settlement agreement and the proposed first amended complaint. The LWDA did not respond.[5]

On December 9, 2019, Turrieta filed a motion for approval of the settlement, with a hearing date of January 2, 2020. She

---

[4] The amount allocated to PAGA group members represents a $5 million payment for "underpaid wages" pursuant to section 558, subdivision (a)(3), and the balance of over $1 million as 25 percent of the recovered penalties paid to employees pursuant to section 2699, subdivision (i).

[5] Although the LWDA did not respond or object to the proposed settlement below, it did file a brief, through the Division of Labor Standards Enforcement, as amicus curiae on appeal, urging us to reverse the trial court's order approving the settlement. Turrieta filed a response to the amicus brief.

argued that the court should approve the settlement, as it was "almost twice the amount of a similar settlement in the rideshare industry that was approved in 2018," citing *Price v. Uber Technologies, Inc.* (Super. Ct. Los Angeles County, 2018, No. BC554512). Turrieta stated that she and Lyft engaged in "extensive informal pre-mediation discovery," including provision by Lyft of the number of pay periods at issue, the number of unique drivers on Lyft's platform each week during the liability period, and detailed data for a sample of 10,000 drivers. Based on that data, Turrieta's counsel "completed an extensive and detailed calculation of the value of the claims in the case" and estimated the maximum liability to be over $30 billion.

Turrieta acknowledged that the Supreme Court's recent decision in *Dynamex Operations West, Inc. v. Superior Court* (2018) 4 Cal.5th 903 (*Dynamex*) established a new test that "poses a higher hurdle for employers" to prove that a worker was an independent contractor rather than an employee. However, she argued that "the uncertainty as to retroactivity of this ruling, as well as disputes as to which claims were subject to *Dynamex*, rendered the impact of *Dynamex* uncertain." Turrieta also informed the court that the parties had attended a full day of mediation in September 2019 with "noted mediator" Antonio Piazza, but were unable to reach an agreement. However, the mediator later "made a settlement proposal representing his own independent valuation of the case, which the parties accepted."

III.    *Motions by Olson and Seifu and Approval of Settlement*

On December 24, 2019, Olson filed a motion to intervene in *Turrieta* and raised objections to the settlement. He stated that he had not been notified by Turrieta's counsel of the proposed settlement and only learned of it on December 20, 2019. Olson

argued that he was entitled to intervene as a matter of right under Code of Civil Procedure section 387, subdivision (d)(1) because he "(1) claims an interest in the property or transaction that is the subject of the litigation; (2) is so situated that the disposition of the action may impair or impede his ability to protect that interest; and (3) will not be adequately represented by the existing party." Alternatively, Olson sought permissive intervention under Code of Civil Procedure section 387, subdivision (d)(2). Olson objected to the proposed settlement as unfair, unreasonable, and inadequate in light of the purposes of PAGA, arguing, among other reasons, that the amount of the penalties paid to the state was "grossly inadequate" given the strength of the claims. In addition, Olson asserted the settlement was secured through a reverse auction, it was obtained by "deliberately excluding" Olson and his counsel from the negotiation, and it included an unjustified amount in attorney fees.

Because the hearing on Olson's motion was set for April 2020, he also filed an ex parte application to continue the January 2020 settlement approval hearing until after his motion to intervene could be heard. The court denied the application on December 26, 2019.[6]

On December 31, 2019, Seifu also filed a motion for leave to intervene in *Turrieta* and an objection to the proposed settlement. Like Olson, he sought to intervene as a matter of

---

[6] There is no transcript in the record from the hearing on the ex parte application. In its subsequent order on January 2, 2020 approving the settlement, the court stated that it had denied the application "after finding that there were no exigent circumstances warranting relief."

7

right, arguing that he had an interest in the action as a member of the PAGA settlement group and as the PAGA representative with the "first-filed" action. He also asked the court to postpone the settlement approval hearing and argued that the settlement was not fair, adequate, or reasonable.

The court held the settlement approval hearing in *Turrieta* on January 2, 2020. Counsel for Turrieta argued that appellants lacked standing to intervene or object to the settlement because "this case belongs exclusively to the State." He also contended that the settlement would be "one of the largest payments" ever received by the state, "so they of course have not objected, they would like to be paid." Lyft's counsel agreed with Turrieta's position.

Counsel for appellants appeared at the hearing and the court allowed them to argue. Seifu's counsel argued that Seifu's case was "the first-filed case" and Lyft had engaged in a reverse auction by settling with Turrieta after it failed to reach an agreement with Seifu. She also argued that Seifu had moved for an injunction in his case, which was stayed pending Lyft's appeal, but that Lyft was attempting to avoid the effect of potential injunctive relief by settling a "copycat" case for monetary penalties. She argued in the alternative that Seifu should be allowed to opt out of the *Turrieta* settlement, so that "he can continue his pursuit of his injunction claim." Olson's counsel contended that the small amount of the settlement compared to the amount of possible liability "does not represent any kind of deterrent or punitive result for a company such as Lyft which is currently employing hundreds of thousands of workers in California and has billions of dollars in revenue each year." He also argued that other drivers should have standing to intervene

and appeal as they would in class actions.

In response to Seifu's arguments, counsel for Lyft contended that injunctive relief was not available under PAGA, and that there was no such motion pending because *Seifu* was stayed. In addition, even if injunctive relief was permitted, the settlement would not preclude injunctive relief. He also disputed the suggestion of gamesmanship in the settlement.

Turrieta's counsel disputed appellants' assertion of standing, arguing that if the court allowed notice to or intervention by another PAGA plaintiff, "you'd be undoing a basic structural element of PAGA" that was distinct from class action procedure. He also reiterated that the amount of the settlement was reasonable compared to past settlements, and rejected the suggestion that the state did not review the proposed settlement, considering it was "their biggest recovery of the year." He emphasized that the settlement was made at arm's length, and was proposed by an experienced, neutral mediator. At the conclusion of the hearing, the court took the matter under submission.

The court issued an order later that day, January 2, 2020. The court overruled Seifu's objection to the settlement, finding that "[a]part from the fact that it was filed on the eve of the hearing, the Court does not believe that he (like Olson) has standing to be heard on this matter." The court held that the real party in interest was the state, citing *Amalgamated Transit Union, Local 1756, AFL-CIO v. Superior Court* (2009) 46 Cal.4th 993 (*Amalgamated*). The court also denied Seifu's request to "opt out" of the settlement, finding he had no legal basis to do so, and was not precluded by the settlement from pursuing a preliminary injunction.

9

The court further found that the settlement was "fair, adequate, and reasonable in light of the time period that is encompassed by it and the amount that will eventually be paid to the State of California and to the hundreds of thousands of Lyft drivers." The court noted it had considered another settlement approved in January 2018 for $7.75 million for a "period three times as long." The court also found that "although it is possible that monetary penalties could be up to $100 billion,[7] given that the claims in this case would likely be considered under pre-*Dynamex* law, it is also possible that the penalties could be zero dollars." The court rejected appellants' assertion that "Lyft engaged in gamesmanship such that plaintiffs in other cases (as well as the State) could be shortchanged. In this regard, the court notes that after the parties engaged in mediation before a very experienced mediator, they were still not able to arrive at a resolution. Instead, they ultimately accepted the mediator's proposal." In addition, the court concluded that it would "not assume that the State of California [h]as not read and seriously considered the proposed settlement. As mentioned above, it is the real party in interest and by not filing an opposition to the settlement, the Court assumes that it agrees that the settlement is appropriate."

The court signed the proposed order submitted by Turrieta, approving the settlement agreement and finding the settlement

---

[7] Turrieta subsequently filed a request for clarification, noting that the record supported a value of "over $10 billion." During the settlement approval hearing, Seifu's counsel argued that the maximum liability totaled over $2 billion, while Olson's counsel estimated it at over $12 billion. Ultimately, this factual dispute is irrelevant to resolution of this appeal.

"is in all respects fair, reasonable and adequate, and complies with the policy goals of the PAGA.  There was no collusion in connection with the Settlement.  The Settlement was the product of informed and arm's-length negotiations among competent counsel and the record is sufficiently developed to have enabled Plaintiff and Defendant to adequately evaluate and consider their respective positions."  The court further found that the settlement agreement was "reasonable as it provides substantial payment for the State of California and will provide the PAGA Settlement Group Members with substantial recovery from a non-reversionary common fund."  The court retained jurisdiction to enforce the settlement agreement, vacated all other hearing dates, and ordered the matter dismissed with prejudice.  The court entered judgment on January 6, 2020.

On January 14, 2020, Olson filed a motion to vacate the *Turrieta* judgment pursuant to Code of Civil Procedure section 663.  He again argued that the court erred in approving the settlement for several reasons, including: (1) the provision paying $5 million to drivers as underpaid wages pursuant to section 558 was barred by the recent Supreme Court decision in *ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175; (2) the amount paid in penalties to the state was unreasonable given the strength of the claims, which the court erroneously found would not be considered under *Dynamex*; (3) the court "ignored the undisputed facts suggesting that Lyft reverse-auctioned the State's claims"; and (4) the court erred in finding that Olson lacked standing to intervene.  Seifu also moved to vacate the judgment on January 21, 2020.[8]  Lyft and Turrieta both opposed the motions.

---

[8] Seifu's motion to vacate the judgment, supporting documents, and reply are not included in the record on appeal.

11

The court held a hearing on the motions to vacate the judgment on February 28, 2020.  Following argument by counsel for appellants and respondents, the court reiterated its finding that the settlement "is in the best interest of the workers and in the best interest of the state of California."  Then, the court found that appellants did not have standing to object to the settlement or to bring a motion to set aside the judgment.  The court subsequently issued a minute order denying the motions.  Olson and Seifu timely appealed.

Respondents moved to dismiss the appeals, arguing that appellants lacked standing.  We issued an order summarily denying the motions to dismiss without prejudice to the parties raising the issue again in their briefing.[9] The parties submitted their briefs and appellate record. After full consideration of the record and relevant legal authorities, we conclude that appellants lack standing to appeal the judgment.  Although they have standing to appeal the trial court's implicit denial of their motions to intervene, we find no error and therefore affirm.

---

After filing his opening brief, he moved to augment the record with these documents and then requested that we take judicial notice of them.  We denied both requests.

[9] A summary denial of a motion to dismiss an appeal does not "preclude later full consideration of the issue, accompanied by a written opinion, following review of the entire record. . . ." (*Kowis v. Howard* (1992) 3 Cal.4th 888, 900, overruling the contrary holding in *Pigeon Point Ranch, Inc. v. Perot* (1963) 59 Cal.2d 227, 230–231; accord, *Dakota Payphone, LLC v. Alcaraz* (2011) 192 Cal.App.4th 493, 509, fn. 6 [reversing prior order and dismissing appeal upon "review of a complete record and further analysis of the law"].)

## DISCUSSION

I.    *PAGA Overview*

"California's Labor Code contains a number of provisions designed to protect the health, safety, and compensation of workers.  Employers who violate these statutes may be sued by employees for damages or *statutory* penalties.  [Citations.] Statutory penalties, including double or treble damages, provide recovery to the plaintiff beyond actual losses incurred.  [Citation.] Several Labor Code statutes provide for additional *civil* penalties, generally paid to the state unless otherwise provided.  [Citation.] Before PAGA's enactment, only the state could sue for civil penalties."  (*Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73, 80 (*Kim*), citing *Iskanian v. CLS Transportation Los Angeles, LLC* (2014) 59 Cal.4th 348, 378 (*Iskanian*).)  The Legislature enacted PAGA in 2003 to allow aggrieved employees to act as private attorneys general and recover civil penalties for Labor Code violations.  (*Arias v. Superior Court* (2009) 46 Cal.4th 969, 980-981 (*Arias*); *Villacres v. ABM Industries Inc.* (2010) 189 Cal.App.4th 562, 578.)  The Legislature's declared purpose in enacting PAGA was "to supplement enforcement actions by public agencies, which lack adequate resources to bring all such actions themselves."  (*Arias, supra*, 46 Cal.4th at p. 986.)

PAGA deputizes "aggrieved" employees to bring a representative lawsuit on behalf of the state to enforce labor laws.  (*Kim, supra*, 9 Cal.5th at p. 81; *Iskanian, supra,* 59 Cal.4th at p. 386.)  An "aggrieved employee" for purposes of bringing a PAGA claim is defined under the statute as "any person who was employed by the alleged violator and against whom one or more of the alleged violations was committed."  (§ 2699, subd. (c); see also *Kim, supra*, 9 Cal.5th at p. 82.)  Although an aggrieved

13

employee is the named plaintiff in a PAGA action, PAGA disputes are between the state and the employer, not between the employee and the employer. (*Iskanian, supra*, 59 Cal.4th at p. 386; *Arias, supra*, 46 Cal.4th at p. 986 [plaintiff represents same legal rights and interests as state labor law enforcement agencies].) Thus, an employee suing under PAGA "does so as the proxy or agent of the state's labor law enforcement agencies. . . . In a lawsuit brought under the act, the employee plaintiff represents the same legal right and interest as state labor law enforcement agencies—namely, recovery of civil penalties that otherwise would have been assessed and collected by the [LWDA]." (*Arias, supra,* 46 Cal.4th at p. 986; accord, *Iskanian, supra,* 59 Cal.4th at p. 380.)

Before filing a PAGA lawsuit, an employee must provide written notice to the LWDA and the employer of the specific Labor Code violations alleged and facts and theories to support the claims. (§ 2699.3, subd. (a)(1)(A).) "If the [LWDA] elects not to investigate, or investigates without issuing a citation, the employee may then bring a PAGA action." (*Williams v. Superior Court* (2017) 3 Cal.5th 531, 545 (*Williams*); see § 2699.3, subd. (a)(2)(A); *Julian v. Glenair, Inc.* (2017) 17 Cal.App.5th 853, 866 (*Julian*).) The notice requirement allows the relevant state agency to decide "whether to allocate scarce resources to an investigation." (*Williams, supra*, 3 Cal.5th at p. 546.) The LWDA receives 75 percent of the civil penalties recovered in an action brought by an aggrieved employee; the remaining 25 percent of the penalties is distributed to the "aggrieved employees." (§ 2699, subd. (i); *Arias, supra*, 46 Cal.4th at pp. 980-981.)

Overlapping PAGA actions may be brought by different employees who allege the same violations and use the same

14

theories. (*Julian, supra,* 17 Cal.App.5th at pp. 866-867.) However, because an employee who brings an action under PAGA does so as the "proxy or agent" of the state, a judgment in an employee's action under PAGA "binds all those, including nonparty aggrieved employees, who would be bound by a judgment in an action brought by the government." (*Arias, supra*, 46 Cal.4th at p. 986.) As our Supreme Court has explained, when an employee plaintiff prevails in a PAGA action, "[n]onparty employees may then, by invoking collateral estoppel, use the judgment against the employer to obtain remedies other than civil penalties for the same Labor Code violation[s]." (*Id.* at p. 987.) "If the employer had prevailed, however, the nonparty employees, because they were not given notice of the action or afforded any opportunity to be heard, would not be bound by the judgment as to remedies other than civil penalties." (*Ibid.*; see also *Williams, supra*, 3 Cal.5th at p. 547, fn. 4 [employees "do not own a personal claim for PAGA civil penalties"].)

If the parties settle a PAGA claim, section 2699, subdivision (l)(2) requires the plaintiff employee to simultaneously submit the proposed settlement to the LWDA and the court, and further requires that the court "review and approve" the settlement. As such, the court must "ensur[e] that any negotiated resolution is fair to those affected." (*Williams, supra*, 3 Cal.5th at p. 549.)

II.    *Analysis*

This appeal presents overlapping challenges to two separate orders. First, appellants seek to appeal from the judgment on the ground that the trial court should not have approved the settlement. They contend that they have standing to do so because they moved to vacate the judgment under Code

15

of Civil Procedure section 663.  Respondents counter that appellants, as nonparties, lacked standing to move to vacate the judgment and therefore cannot use those motions as a basis for appeal.  We agree with respondents and the trial court that due to the unique nature of PAGA, in which the state is the real party in interest, appellants had no personal interest in *Turrieta* and therefore are not "aggrieved parties" who may appeal from the judgment.

Second, appellants challenge the trial court's denial of their motions to intervene in *Turrieta*.  Again, they argue that they had a personal interest in the *Turrieta* proceedings and proposed settlement because they were deputized to prosecute PAGA claims on behalf of the state.  Respondents assert that this issue is outside the scope of the appeal and, additionally, that appellants are not entitled to intervene.  Although we agree with appellants that they may raise this issue on appeal, we conclude that the trial court did not err in denying them intervention.

A.    *Motion to vacate judgment*

Respondents contend that appellants lacked standing below to bring a motion to set aside the judgment pursuant to Code of Civil Procedure section 663, and lack standing to appeal from the judgment for the same reasons.  We agree.

Code of Civil Procedure section 902 allows "'[a]ny party aggrieved'" to appeal from a judgment.  Thus, "[t]he test is twofold—one must be both a party of record to the action *and* aggrieved to have standing to appeal."  (*Shaw v. Hughes Aircraft Co.* (2000) 83 Cal.App.4th 1336, 1342; see also *Hernandez v. Restoration Hardware, Inc.* (2018) 4 Cal.5th 260, 263 (*Hernandez*).)  However, a nonparty that is aggrieved by a judgment or order may become a party of record and obtain the

16

right to appeal by moving to vacate the judgment pursuant to Code of Civil Procedure section 663. (*Hernandez, supra*, 4 Cal.5th at p. 267, citing *Eggert v. Pac. States S. & L. Co.* (1942) 20 Cal.2d 199, 201; *County of Alameda v. Carleson* (1971) 5 Cal.3d 730, 736, 738 (*Carleson*) [one who is legally "aggrieved" by judgment may become "party of record" with the right to appeal by moving to vacate judgment for "incorrect legal conclusion" or "erroneous judgment upon the facts"].) Similarly, pursuant to Code of Civil Procedure section 663, a "party aggrieved" may move for a judgment "to be set aside and vacated . . . and another and different judgment entered, . . . materially affecting the substantial rights of the party and entitling the party to a different judgment." Thus, in order for appellants to have standing to bring a motion to vacate the judgment or to appeal from that judgment, they must have been "aggrieved" by the judgment.

A party is aggrieved "only if its 'rights or interests are injuriously affected by the judgment.'" (*Sabi v. Sterling* (2010) 183 Cal.App.4th 916, 947, quoting *Carleson, supra*, 5 Cal.3d at p. 737.) The aggrieved party's interest "must be immediate, pecuniary, and substantial and not nominal or a remote consequence of the judgment." (*Carleson, supra*, 5 Cal.3d at p. 737; see also *Howard Contracting, Inc. v. G.A. MacDonald Construction Co., Inc.* (1998) 71 Cal.App.4th 38, 58.)[10]

---

[10] We note that whether someone is an "aggrieved employee" as defined by section 2699, subdivision (c) and thus able to bring a lawsuit under PAGA is a distinct inquiry from whether a nonparty may become an aggrieved *party* because of a personal interest in a different lawsuit and thereby obtain standing to challenge the judgment. None of the parties here

17

Appellants contend they are "aggrieved" parties because of their status as designated proxies for the state. Olson argues that the settlement has an "'immediate, pecuniary, and substantial' effect on the State (and Olson as the State's proxy): it extinguishes the claims Olson was deputized to pursue for less than pennies on the dollar." Similarly, Seifu contends that he has "an interest in representing the State's interest" in "achieving the maximum recovery possible for Lyft's misdeeds," and deterring future violations.

We are not persuaded that appellants' role as PAGA plaintiffs confers upon them a personal interest in the settlement of another PAGA claim. As our Supreme Court recently explained: "A PAGA claim is legally and conceptually different from an employee's own suit for damages and statutory penalties. An employee suing under PAGA 'does so as the proxy or agent of the state's labor law enforcement agencies.'" (*Kim*, *supra*, 9 Cal.5th at p. 81, quoting *Arias, supra*, 46 Cal.4th at p. 986.) As such, "[e]very PAGA claim is 'a dispute between an employer and the state.' [Citations.] . . . . Relief under PAGA is designed primarily to benefit the general public, not the party bringing the action." (*Ibid.*; see also *Iskanian, supra*, 59 Cal.4th at p. 386; *Arias, supra*, 46 Cal.4th at p. 986.) "'A PAGA representative action is therefore a type of qui tam action,'" and the "government entity on whose behalf the plaintiff files suit is always the real party in interest." (*Ibid.*, quoting *Iskanian, supra*, 59 Cal.4th at p. 382.)[11]

have claimed otherwise.

[11] As such, Seifu's contention that he "supplanted the State as the real party in interest" is meritless.

In *Amalgamated, supra,* 46 Cal.4th at p. 1003, the court rejected an attempt by a labor union to bring a PAGA claim as the assignee of the employees who had suffered injury. The court reasoned that the claim could not be assigned because PAGA "does not create property rights or any other substantive rights. Nor does it impose any legal obligations. It is simply a procedural statute allowing an aggrieved employee to recover civil penalties—for Labor Code violations—that otherwise would be sought by state labor law enforcement agencies." (*Ibid.*) Thus, the court held that an aggrieved employee could not assign a PAGA claim for "statutory penalties because the employee does not own an assignable interest." (*Ibid.*)

Consequently, appellants' ability to file PAGA claims on behalf of the state does not convert the state's interest into their own or render them real parties in interest. (*Amalgamated, supra*, 46 Cal.4th at p. 1003; *Arias, supra*, 46 Cal.4th at p. 986.) Appellants were deputized under PAGA to prosecute their employer's Labor Code violations on behalf of the state; they fail to point to any authority allowing them to act on the state's behalf for all purposes. Because it is the state's rights, and not appellants', that are affected by a parallel PAGA settlement, appellants are not aggrieved parties with standing to seek to vacate the judgment or appeal.[12] Nor can appellants claim a pecuniary interest in the penalties at issue, as the "civil penalties recovered on the state's behalf are intended to 'remediate present violations and deter future ones,' not to redress employees'

---

[12] To the extent Seifu additionally contends that his purported status as the "first-filed" PAGA plaintiff creates a personal interest in the settlement of a later-filed PAGA action, he cites no authority supporting that contention.

19

injuries." (*Kim, supra*, 9 Cal.5th 73, 86, quoting *Williams, supra*, 3 Cal.5th at p. 546; see also *Iskanian, supra*, at p. 381.)

We disagree with Olson's prediction that denying him status as an aggrieved party will "have the dangerous effect of insulating all PAGA settlement approval orders from objection at the trial court level and subsequent appellate review," allowing a plaintiff to "settle PAGA claims on patently unreasonable terms." PAGA expressly requires notice of a proposed settlement to both the LWDA and the trial court, and directs the court to review the settlement prior to approval. (§ 2699, subd. (l)(2); see also *Williams, supra*, 3 Cal.5th at p. 549 [court must "ensur[e] that any negotiated resolution is fair to those affected"].) These procedures were followed here.[13] Moreover, as evidenced by several of the cases cited by appellants, the LWDA may provide the trial court with comments on or objections to a proposed settlement, and has done so in the past. (See *O'Connor v. Uber Technologies, Inc.* (N.D. Cal. 2016) 201 F.Supp.3d 1110, 1113 [noting that the court "invited and considered the comments" of the LWDA before rejecting the proposed settlement of class and PAGA claims].) Here, the LWDA did not raise objections to the settlement until it submitted an amicus brief on appeal, but that does not invalidate the protections provided by PAGA's notice and review requirements.[14]

---

[13] We also note that, while it did not allow appellants to intervene, the trial court did allow appellants to submit objections, and to present argument at two hearings, and it addressed those objections (albeit briefly) in its order approving the settlement.

[14] The LWDA raises several objections to the settlement in its amicus brief; in particular, it contends that the settlement released claims (newly added to the FAC) that Turrieta was not

Appellants also argue that they are aggrieved as nonparty employees who would be bound by the judgment. But the settlement of Turrieta's PAGA claims is only binding with respect to the state's assertion of the same PAGA claims and recovery of the same civil penalties—not any personal claims appellants may have against Lyft. (See *Julian, supra*, 17 Cal.App.5th at p. 867 ["under the doctrine of collateral estoppel, a [PAGA] judgment . . . binds the government, as well as all aggrieved nonparty employees potentially entitled to assert a PAGA action"].) As the *Williams* court explained: "absent employees do not own a personal claim for PAGA civil penalties (see *Amalgamated*[, *supra*,] 46 Cal.4th [at p.] 1003), and whatever personal claims the absent employees might have for relief are not at stake (*Iskanian*

deputized to pursue because she never gave the requisite 65-day notice to the state under section 2699.3, subdivision (a). This argument should have been addressed to the trial court below. If the LWDA had asserted its objections before the trial court (or at a minimum, requested more time to consider the proposal), it could have provided the court with potentially useful information in considering the fairness of the settlement. Instead, it did so only belatedly and in its limited role as amicus on appeal. Moreover, regardless of the standing issue, neither appellant timely raised the argument that adding causes of action in the FAC required a new notice to the state—Seifu did not raise it at all and Olson did so only in a single paragraph at the very end of his reply in support of his motion to vacate. This issue is therefore forfeited and we would not consider it, even if appellants had standing to raise it. (See *St. Mary v. Superior Court* (2014) 223 Cal.App.4th 762, 783 ["points raised in a reply brief for the first time will not be considered unless good cause is shown for the failure to present them before"]; *Balboa Ins. Co. v. Aguirre* (1983) 149 Cal.App.3d 1002, 1010.)

21

[ ], *supra*, 59 Cal.4th at p. 381 ["The civil penalties recovered on behalf of the state under the PAGA are distinct from the statutory damages to which employees may be entitled in their individual capacities"])." (*Williams*, *supra*, 3 Cal.5th at p. 547, fn. 4; see also *Sakkab v. Luxottica Retail North America, Inc.* (9th Cir. 2015) 803 F.3d 425, 436.) Thus, the settlement forecloses only the *state's* ability to seek the same civil penalties; it does not bar any claims owned by appellants and therefore does not injure their personal interests.

The unique nature of a PAGA claim is further underscored by the distinction between a PAGA claim and a class action. "In a class action, the 'representative plaintiff still possesses only a single claim for relief—the plaintiff's own,'" and the class action is used as a procedural device to aggregate numerous individual claims. (*Kim, supra*, 9 Cal.5th at pp. 86-87, quoting *Watkins v. Wachovia Corp.* (2009) 172 Cal.App.4th 1576, 1589.) "'But a representative action under PAGA is not a class action.' [Citation.] There is no individual component to a PAGA action because 'every PAGA action . . . is a representative action on behalf of the state.'" (*Ibid.*, quoting *Iskanian, supra*, 59 Cal.4th at p. 387.) As a result, unlike a class action, PAGA has no notice requirements for unnamed aggrieved employees, nor may such employees opt out of a PAGA action. (See *Sakkab v. Luxottica Retail North America, Inc., supra,* 803 F.3d at p. 436; see also *Arias, supra*, 46 Cal.4th at p. 987 ["the nonparty employees, because they were not given notice of the action or afforded any opportunity to be heard, would not be bound by the judgment as to remedies other than civil penalties"].)[15] Here, appellants have

_____

[15] Although appellants complained to the trial court and on appeal that they were not notified of the settlement, they cite no

no individual claims that would be affected by the settlement and are therefore not "aggrieved" for the purposes of standing to move to vacate or appeal from that judgment.

>    B.    *Motion to intervene*

>        1.    *Scope of appeal*

We next turn to appellants' challenge to the court's denial of their motions for intervention pursuant to Code of Civil Procedure section 387. As an initial matter, respondents contend that appellants have not properly raised this issue on appeal because the trial court never denied the motions and appellants did not appeal from any such denial.

From the record before us, it appears that the court did not issue an order specifically denying appellants' motions to intervene. However, Olson argues that the court effectively denied his motion when it vacated the scheduled hearing and denied his motion to vacate the judgment.[16] We find that the record supports the conclusion that the trial court denied appellants' motions for intervention.[17] In its January 2, 2020

---

authority entitling them to such notice. Similarly, appellants devoted much of their briefing and most of their time during oral argument on appeal to policy arguments (despite the panel's inquiries on the standing issue). The policy issues appellants raise are best addressed to the Legislature.

[16] Despite its length, Seifu's reply brief is largely silent as to respondents' challenges to intervention. In his opening brief, he commingles the discussion regarding the motion to vacate and intervention.

[17] Respondents do not dispute that an order denying intervention would be appealable. (See *Carleson, supra*, 5 Cal.3d at p. 736 ["[O]ne who is denied the right to intervene in an action ordinarily may not appeal from a judgment subsequently entered in the case. [Citations.] Instead, he may appeal from the order

---

order, the court addressed the issues raised by the parties regarding intervention, expressly finding that Seifu and Olson did not have standing to be heard, because the state was the real party in interest. The court also vacated the scheduled hearing on the motions to intervene. As such, the trial court's January 2, 2020 order effectively denied appellants' motions for intervention.

Respondents also contend that appellants appealed only from the denial of their motions to vacate, not from any order denying intervention. "[I]t is and has been the law of this state that notices of appeal are to be liberally construed so as to protect the right of appeal if it is reasonably clear what appellant was trying to appeal from, and where the respondent could not possibly have been misled or prejudiced." (*Etheridge v. Reins Internat. California, Inc.* (2009) 172 Cal.App.4th 908, 913, quoting *Luz v. Lopes* (1960) 55 Cal.2d 54, 59; Cal. Rules of Court, rule 8.100(a)(2).) In Seifu's notice of appeal, he expressly appealed from both the January 2 and February 28, 2020 orders. Olson's notice of appeal lists only the February 28, 2020 order denying the motion to vacate; however, in his description of the issues to be raised on appeal, he included the court's refusal to hear his motion to intervene. Moreover, all the parties addressed the issue of intervention in their briefs on appeal. As such, we construe appellants' notices of appeal as taken from both the order denying their motions to vacate the judgment and the implicit order denying intervention.

---

denying intervention."]; see also *Hodge v. Kirkpatrick Development, Inc*. (2005) 130 Cal.App.4th 540, 547 (*Hodge*) [an order denying a motion to intervene is appealable "because it finally and adversely determines the moving party's right to proceed in the action"].)

24

### 2. *Code of Civil Procedure section 387*

Code of Civil Procedure section 387 allows either mandatory or permissive intervention.  A nonparty has a right to mandatory intervention where "[t]he person seeking intervention claims an interest relating to the property or transaction that is the subject of the action and that person is so situated that the disposition of the action may impair or impede that person's ability to protect that interest, unless that person's interest is adequately represented by one or more of the existing parties." (Code Civ. Proc., § 387, subd. (d)(1).)  Thus, "the threshold question is whether the person seeking intervention has 'an interest relating to the *property or transaction* which is the subject of the action.'"  (*Siena Court Homeowners Assn. v. Green Valley Corp.* (2008) 164 Cal.App.4th 1416, 1423, quotation omitted; *Mylan Laboratories, Inc. v. Soon–Shiong* (1999) 76 Cal.App.4th 71, 78 (*Mylan*).)

Permissive or discretionary intervention under Code of Civil Procedure section 387, subdivision (d)(2) also requires a showing that "the nonparty has a direct and immediate interest in the action," among other criteria.  (*Reliance Insurance Co. v. Superior Court* (2000) 84 Cal.App.4th 383, 386.)  "The requirement of a direct and immediate interest means that the interest must be of such a direct and immediate nature that the moving party '"will either gain or lose by the direct legal operation and effect of the judgment."'"  (*City and County of San Francisco v. State of California* (2005) 128 Cal.App.4th 1030, 1036.)  "Conversely, '[a]n interest is . . . insufficient for intervention when the action in which intervention is sought does not directly affect it although the results of the action may indirectly benefit or harm its owner.'"  (*Ibid*.)

25

### 3. *Standard of review*

The parties dispute the appropriate standard of review. Several appellate courts have implicitly applied the de novo standard of review to an order denying mandatory intervention. (See, e.g., *Hodge, supra*, 130 Cal.App.4th at pp. 548–550; *Mylan, supra*, 76 Cal.App.4th at pp. 78–80.) Turrieta, on the other hand, argues that the applicable standard is abuse of discretion, citing *Reliance Insurance Co. v. Superior Court, supra,* 84 Cal.App.4th at p. 386. We conclude that the denial of mandatory intervention was proper under either standard. We review the denial of permissive intervention for an abuse of discretion. (See *id.* at p. 386; *Truck Ins. Exchange v. Superior Court* (1997) 60 Cal.App.4th 342, 345.)

### 4. *Denial of Intervention*

Appellants contend the trial court should have granted their motions based on either mandatory or permissive intervention. Both mandatory and permissive intervention require a motion to intervene to be made "upon timely application." (Code Civ. Proc. § 387, subds. (d)(1), (2).) Respondents argue that neither appellant's motion was timely, as they knew about the *Turrieta* action for many months but did not seek to intervene, even after the court in *Olson* denied Olson's motion to coordinate the cases. Appellants counter that timeliness is measured from the date the intervenors "knew or should have known their interests were not being adequately represented." (*Lofton v. Wells Fargo Home Mortgage, Inc.* (2018) 27 Cal.App.5th 1001, 1013.) According to appellants, they had no reason to believe their interests were not being protected by Turrieta as another proxy until they became aware of the terms of the settlement.

26

Although the trial court noted that Seifu's motion to intervene was filed on the eve of the settlement approval hearing, it is not apparent from the record that the court made a finding of untimeliness as a basis to deny intervention. We need not resolve this issue. Even if we found that appellants' motions were timely, we nevertheless would conclude that they failed to establish a right to intervention.

Appellants cannot meet the threshold showing that they had a direct and immediate interest in the settlement, which would establish their entitlement to mandatory or permissive intervention. Appellants' claim that they had a qualifying interest fails for the same reason they could not establish they were "aggrieved" for the purposes of standing. As we explained in our discussion of standing above, appellants' position as PAGA plaintiffs in different PAGA actions does not create a direct interest in *Turrieta*, in which they are not real parties in interest. Appellants' interest in pursuing enforcement of PAGA claims on behalf of the state cannot supersede the same interest held by Turrieta in her own PAGA case. As with standing, appellants have no personal interest in the PAGA claims and any individual rights they have would not be precluded under the PAGA settlement. (*Amalgamated*, *supra*, 46 Cal.4th at p. 1003; *Arias, supra*, 46 Cal.4th at p. 986.) Thus, the trial court did not err in denying appellants' motions to intervene.

27

## DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

## CERTIFIED FOR PUBLICATION

COLLINS, J.

We concur:

MANELLA, P. J.

CURREY, J.